IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | No. 1:21-CR-118 (TSE) |
| ) | |
| v.                              ) | COUNT ONE: |
| ) | Conspiracy To Commit Wire Fraud and |
| ) | Bank Fraud |
| BRETT A. AMENDOLA,              ) | (18 U.S.C. § 1349) |
| ) | |
| Defendant      ) | COUNTS TWO THROUGH EIGHT: |
| ) | Wire Fraud |
| ) | (18 U.S.C. § 1343) |
| ) | |
| ) | COUNTS NINE AND TEN: |
| ) | Bank Fraud |
| ) | (18 U.S.C. § 1344) |

INDICTMENT

May Term 2021 – At Alexandria

THE GRAND JURY CHARGES THAT:

GENERAL ALLEGATIONS

INTRODUCTION

At all times material to this indictment:

1.     Defendant BRETT A. AMENDOLA lived in Loudoun County, Virginia, in the Eastern District of Virginia. Co-Conspirator #1 lived in Ashburn, Virginia, in the Eastern District of Virginia. Co-Conspirator #1 is one of AMENDOLA's relatives.

2.     As discussed below, from at least in or about April 2017 through August 2020,[1] AMENDOLA used numerous bank, brokerage, and other financial accounts

---

[1] All dates subsequently alleged in this indictment occurred on or about those dates. All amounts alleged in this indictment are approximate.

-1-

opened under several different names to defraud various individuals by what is known as a *"Ponzi* scheme." As part of the scheme, AMENDOLA obtained money from his victims with the knowingly false and fraudulent promise that the victims would receive quick repayment and large rates of return on their investments. AMENDOLA also made various false statements to his victims concerning how the victims' money would be used.

3.     Contrary to his promises to his victims, AMENDOLA used money he obtained from his later victims to make partial payments to his earlier victims, by which he sought to lull the victims into a false sense of security in the soundness of their investment with AMENDOLA. When victims complained to AMENDOLA about his failure to repay them as promised, he made various lulling statements to the victims concerning the state and profitability of their investments and continued to make partial payments to some victims with money obtained from other victims.

4.     Contrary to AMENDOLA's promises to his victims, AMENDOLA also used the victims' money to pay his personal expenses; to gamble at various casinos; to pay for a 2017 Porsche Panamera; to pay rent for an expensive home in Leesburg, Virginia; to make high-risk investments that were other than what he had promised to his victims; and as mentioned, to make lulling payments to earlier victims of his *Ponzi* scheme.

5.     Company #1 was an entity registered with the Virginia Corporation Commission in the Eastern District of Virginia by Co-Conspirator #1 on July 12, 2019.

6.     Company #2 was a construction company that was owned by Co-Conspirator #1 and that was located in Ashburn, Virginia, in the Eastern District of Virginia.

7.     Company #3 was a shell corporation incorporated in Virginia on February 8, 2017.  AMENDOLA was a manager of Company #3.  Another of AMENDOLA's relatives was Company #3's director, president, treasurer, and secretary.

8.     Company #4 was a shell corporation incorporated by this other relative on April 26, 2017.  Its website was registered by AMENDOLA.  The 2017 Porsche Panamera that AMENDOLA drove was titled in the name of Company #4.  The Porsche Panamera was purchased in or around June 2017 for $103,971 with a $93,091 loan fraudulently obtained from M&T Bank.  Co-Conspirator #1 was a co-applicant on the M&T Bank loan and identified himself as Company #4's director on the vehicle's purchase and loan records.  AMENDOLA and Co-Conspirator #1 defaulted on the M&T Bank loan.

9.     As discussed below, AMENDOLA and Co-Conspirator #1 used Company #2 and Company #1 to obtain fraudulent loans through the Paycheck Protection Program, which was part of the Coronavirus Aid, Relief, and Economic Security Act.  The Program provided, among other things, forgivable loans to small businesses so that they could meet their payrolls and retain their employees.  To obtain the fraudulent loans, AMENDOLA and Co-Conspirator #1 lied to the lender about, among other things, the number of employees that Company #2 and Company #1 employed and the amount of the entities' payroll.  AMENDOLA used some of the proceeds from the loans to make partial payments to some of the victims of the *Ponzi* scheme.

THE PONZI SCHEME

The victims of AMENDOLA's *Ponzi* scheme included the following:

*Victim #1*

10.     AMENDOLA falsely and fraudulently promised Victim #1 that if Victim #1 invested with AMENDOLA he would match Victim #1's investments dollar-for-dollar

and that he would deposit all of the funds into a trading account from which AMENDOLA would trade financial instruments. AMENDOLA falsely and fraudulently promised that AMENDOLA would give Victim #1 access to the trading account and that Victim #1 would receive distributions from the trading account that matched any distributions taken by AMENDOLA.

11.     Victim #1 wired AMENDOLA $10,000 on October 30, 2018, $10,000 on October 31, 2018, and $5,000 on November 1, 2018. TD Bank Account #1, which received the wires, had an opening balance of $0.50 the day the first wire was received. On November 26, 2018, Victim #1 gave AMENDOLA an additional $14,500 via PayPal because AMENDOLA falsely and fraudulently claimed that he needed the money immediately to cover an options trade that AMENDOLA had executed. TD Bank Account #2, which received the PayPal deposit, had an opening balance of $161 the day the deposit was received. On January 23, 2019, Victim #1 gave AMENDOLA an additional $9,000 via PayPal and a $14,000 check because AMENDOLA again falsely and fraudulently claimed that the money was needed immediately to cover an options trade. SunTrust Account #1, which received the PayPal deposit, had an opening balance of $2,490 the day the PayPal deposit was received.

12.     Despite AMENDOLA's promise to deposit the funds in a joint trading account and make a matching deposit, AMENDOLA failed to do so. In fact, AMENDOLA never opened an investment account with Victim #1 as an owner. Instead, $19,000 of Victim #1's funds was comingled with other victim's funds in Co-Conspirator #1's Charles Schwab Account, while the rest – more than $43,000 – was diverted to other purposes. For example, AMENDOLA used much of Victim #1's money to pay third parties and to pay $4,600 to the owner of the home AMENDOLA was renting.

AMENDOLA also converted $29,700 of Victim #1's investment into cash. AMENDOLA never made any deposits to match the investments made by Victim #1.

13.     AMENDOLA never provided Victim #1 with access to a trading account. AMENDOLA falsely and fraudulently told Victim #1 that he was transferring the account from TD Ameritrade to Interactive Brokers and that he would provide Victim #1 the login information after the transfer was completed. AMENDOLA repeatedly delayed providing Victim #1 with login information for the supposed account, including by giving Victim #1 false login information.

14.     Of the $20,000 that Victim #1 wired to AMENDOLA on October 30 and 31, 2018, $11,500 was wired to Co-Conspirator #1's Charles Schwab Account. That month, AMENDOLA lost $31,000 in Co-Conspirator #1's Charles Schwab Account through risky trading in complex securities. Of the $14,500 Victim #1 gave AMENDOLA via PayPal on November 26, 2018, $7,000 was wired to Co-Conspirator #1's Charles Schwab Account. That month, AMENDOLA lost $59,000 in Co-Conspirator #1's Charles Schwab Account through risky trading in complex securities.

15.     AMENDOLA made various false lulling statements to Victim #1. For example, on November 28, 2018, AMENDOLA sent an email to Victim #1 falsely and fraudulently claiming that AMENDOLA was "just playing it safe." On November 29, 2018, AMENDOLA sent an email to Victim #1 falsely and fraudulently saying "I want to stick with being conservative. Let's play the week out and wait until Monday. Paying these huge premiums seems like too big a risk." On December 11, 2018, AMENDOLA sent Victim #1 emails falsely and fraudulently saying that AMENDOLA was "taking a conservative and patient approach" and "we are up $2900."

*Victim #2*

16.    In late 2018, AMENDOLA falsely and fraudulently told Victim #2 that he had an "amazing opportunity" involving a hemp farm located in Maryland. AMENDOLA told Victim #2 that if she lent him $50,000 on a Monday, he would repay her $70,000 by Thursday.  AMENDOLA told Victim #2 that he needed to borrow $50,000 because he had to demonstrate that he had this much to invest in the farm. Victim #2 also lent AMENDOLA money for a beverage company that he said he was starting.

17.    AMENDOLA received $134,550 from Victim #2.  Although AMENDOLA eventually "repaid" Victim #2 eighteen months later, the money AMENDOLA gave her included money provided by other unwitting victims of AMENDOLA's *Ponzi* scheme.

18.    In or about November 2018, rather than applying Victim #2's funds as promised, AMENDOLA caused the following transactions, among others, on the dates below:

      a.    On November 15, 2018, Victim #2 wired $58,000 to TD Bank Account #1;

      b.    On the same day:

            i.    The opening balance of TD Bank Account #1 was $560;

            ii.    A $10,000 check AMENDOLA wrote payable to Victim #11 cleared TD Bank Account #1; and

            iii.    AMENDOLA sent two wires totaling $35,000 from TD Bank Account #1 to Co-Conspirator #1's Charles Schwab Account.

     c.    From November 16, 2018, through November 19, 2018, AMENDOLA gambled and lost almost $3,000 at Hollywood Casino and Charlestown Races;

     d.    On November 27, 2018, Victim #2 wired $13,000 to TD Bank Account #1;

     e.    On the same day:

          i.    The opening balance of TD Bank Account #1 was $467;

          ii.    AMENDOLA wired $10,000 from TD Bank Account #1 to Co-Conspirator #1's Charles Schwab Account;

          iii.    AMENDOLA made a $2,000 cash withdrawal from TD Bank Account #1.

     f.    During November 2018, AMENDOLA lost $59,000 in Co-Conspirator #1's Charles Schwab Account through risky trading in complex securities.

19.    In or about December 2018, AMENDOLA caused the following transactions, among others, on the dates below:

     a.    On December 19, 2018, Victim #2 wired $30,000 to TD Bank Account #1, which had an opening account balance of negative $446 on December 19, 2018;

     b.    On the same day, a $7,500 check AMENDOLA wrote payable to Victim Entity #4 cleared TD Bank Account #1;

     c.    On the next day, December 20, 2018:

          i.    AMENDOLA transferred $29,000 from TD Bank Account #1 to TD Bank Account #2;

    ii.    AMENDOLA transferred $28,500 from TD Bank Account #2 to TD Bank Account #3, which had a balance of $0.03 prior to the transfer;

    iii.    AMENDOLA wired $5,000 to Victim #10 from TD Bank Account #3;

    iv.    AMENDOLA wired $5,700 wire to Victim Entity #1 from AMENDOLA's TD Bank Account #3;

    v.    AMENDOLA wired $16,500 to Co-Conspirator #1's Interactive Brokers Account #1 from TD Bank Account #3; and

    vi.    Co-Conspirator #1 wrote a $50,000 check to Victim #2 from Wells Fargo Account #3, which had a balance of $904 immediately before the $50,000 check cleared and of negative $49,095 immediately afterwards.

d.    On December 24, 2018, Victim #2 wired $31,000 to TD Bank Account #2, which had a balance of $1,096 prior to receiving the wire;

e.    Two days later, on December 26, 2018:

    i.    AMENDOLA wired $6,000 to Victim Entity #1 from TD Bank Account #2; and

    ii.    AMENDOLA wired $18,000 from TD Bank Account #2 to Co-Conspirator #1's Interactive Brokers Account #1, which had been opened on December 14, 2018.

  f.  Interactive Brokers Account #1 had a closing balance of $62,347 on December 31, 2018, but AMENDOLA lost more than $89,000 through risky trading in complex securities during January 2019, which left Interactive Brokers Account #1 with a balance of $30 on January 31, 2019; and

  g.  During December 2018, AMENDOLA lost more than $11,000 in Co-Conspirator #1's Charles Schwab Account through risky trading in complex securities.  This left a balance in the account of less than $2.00.

*Victim #3*

20.  In mid-2019, Victim #3 learned that AMENDOLA was trying to establish a new hemp farm through Company #1, AMENDOLA's company.  AMENDOLA was in charge of the farm and oversaw the project.

21.  In July 2019, AMENDOLA falsely and fraudulently told Victim #3 that the farm was short on cash because the investors who were going to provide the funding were a little delayed.  Victim #3 agreed to make a short-term loan so that the project could continue moving forward while the investors' funding came through.  AMENDOLA falsely and fraudulently told Victim #3 that the loan would be repaid within thirty days.

22.  Victim #3 agreed to give his credit card information to Co-Conspirator #1, who then ran charges on the card to access cash.  In or about July 2019, AMENDOLA charged Victim #3's American Express ("AmEx") card a total of $52,583.

23.    On July 24, 2019, AMENDOLA gave Victim #3 a worthless promissory note, which falsely and fraudulently stated that AMENDOLA and Company #1 would pay Victim #3 $57,500 plus $10,000 in interest on August 15, 2019.

24.    Rather than applying Victim #3's funds as promised, AMENDOLA caused the following transactions, among others, on the dates below:

a.    On July 19, 2019, and July 20, 2019, Co-Conspirator #1 charged $19,155 to Victim #3's AmEx card;

b.    On July 22, 2019, the payment processor for Co-Conspirator #1's company, Company #2, deposited a corresponding amount, $18,484, to Wells Fargo Account #2, which had a balance of $7,641 prior to the deposit;

c.    On the same day:

    i.    Cash withdrawals totaling $2,300 were made from Wells Fargo Account #2;

    ii.    Co-Conspirator #1 transferred $18,500 to Wells Fargo Account #1, which had a balance of negative $3,497 prior to receiving the transfers;

    iii.    A $5,500 check to Victim #15 cleared Wells Fargo Account #1; and

    iv.    Cash withdrawals totaling $2,700 were made from Wells Fargo Account #1.

d.    On July 22 through 25, 2019, AMENDOLA caused the following transactions:

i.   On July 22, 2019, Co-Conspirator #1 charged $8,900 to Victim #3's AmEx card and a corresponding deposit of $8,588 was made to Wells Fargo Account #2, which had a balance of $2,314 prior to the deposit;

ii.  On July 23, 2019, $7,500 was transferred from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of $2,201 prior to the transfer;

iii. On July 23, 2019, cash withdrawals totaling $1,800 were made from Wells Fargo Account #1;

iv.  On July 23, 2019, an additional charge of $9,945 was made to Victim #3's AmEx card and a corresponding deposit of $10,369 was made the next day to Wells Fargo Account #2, which had a balance of $1,010 prior to the deposit;

v.   On July 24, 2019, $1,600 was withdrawn in cash from Wells Fargo Account #2 and $7,500 was transferred from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of $7,873 prior to the transfer;

vi.  On July 24, 2019, a $5,800 check AMENDOLA wrote to Victim Entity #2 and a $2,000 check AMENDOLA wrote to Victim #2 cleared Wells Fargo Account #1;

vii. On July 24, 2019, a $1,000 wire was sent to Victim Entity #3 and a $2,500 wire was sent to Victim #10 from Wells Fargo Account #1;

        viii.   On July 24, 2019, Co-Conspirator #1 charged another $9,650 to Victim #3's AmEx card and a corresponding deposit of $9,312 was made the next day to Wells Fargo Account #2, which had a balance of $2,238 prior to the deposit; and

        ix.   On July 25, 2019, $5,800 in cash was withdrawn from Wells Fargo Account #2 and $7,000 was transferred from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of $2,013 prior to the transfer. The same day, following the transfer, $2,300 was withdrawn in cash from Wells Fargo Account #1;

   e.   On July 29, 2019, Co-Conspirator #1 charged $4,933 to Victim #3's AmEx card, resulting the following day in a corresponding deposit of $4,760 to Wells Fargo Account #2, which had a balance of $773 prior to the deposit.

   f.   On July 30, 2019, $4,500 was transferred from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of $201 prior to the transfer, and a $2,970 check AMENDOLA wrote to another individual cleared Wells Fargo Account #1.

*Victim #4*

25.    In late August 2019, AMENDOLA told Victim #4 about Company #1, which AMENDOLA described as an industrial hemp company or farm that AMENDOLA owned with Co-Conspirator #1. AMENDOLA falsely and fraudulently claimed that Company #1 had no debt or other investors or owners. AMENDOLA falsely and

fraudulently told Victim #4 that Company #1 had a contract in place to sell its hemp after it was harvested, but that AMENDOLA needed money to complete the harvest and go to market. AMENDOLA also falsely and fraudulently claimed that Co-Conspirator #1 had put $150,000 of his own money into Company #1, but that they needed additional funds to pay for harvest-related expenses.

26.     Victim #4 loaned AMENDOLA and Company #1 more than $50,000. Initially, AMENDOLA falsely and fraudulently promised to pay $75,000 to Victim #4 after the hemp was harvested in return for the $50,000 loan. Later, AMENDOLA falsely and fraudulently promised Victim #4 a forty-percent ownership interest in Company #1 in addition to the promised $25,000 profit.

27.     AMENDOLA drafted a false and fraudulent contract, which was notarized, that purported to set forth the specifics of the agreement. The parties involved in the contract were Victim #4, AMENDOLA, Co-Conspirator #1, Company #1, and Company #3. In the contract, the owners of Company #1 were identified as Co-Conspirator #1, with a sixty-percent ownership interest, and Victim #4, with a forty-percent ownership interest. The contract falsely and fraudulently claimed that Co-Conspirator #1 contributed $150,000 in cash to Company #1.

28.     AMENDOLA falsely and fraudulently promised Victim #4 that the money he loaned to AMENDOLA and Company #1 was only to be spent on Company #1-related harvest and marketing expenses. AMENDOLA also falsely and fraudulently promised Victim #4 that Company #1 had no debt and that therefore the money Victim #4 loaned to AMENDOLA and Company #1 would not to be used to repay debt.

29.     On August 29, 2019, AMENDOLA deposited a $2,500 cashier's check from Victim #4 in Wells Fargo Account #1, which had a balance of negative $661 prior to the

-13-

deposit. The check contained the memo, "LOAN #1 + CASH $4000." The next day, AMENDOLA wired $5,000 from Wells Fargo Account #1 to Victim #3's business.

30. On September 5, 2019, Victim #13 (Victim #4's brother) wired $7,800 to Wells Fargo Account #1, which had a balance of negative $46 prior to receiving the wire. The same day, AMENDOLA sent Victim #18 a $500 Zelle payment, transferred $500 to Wells Fargo Account #4, and withdrew $300 in cash, all from Wells Fargo Account #1.

31. On September 13, 2019, Victim #4 wired $12,700 to Wells Fargo Account #1, which had a balance of $3,422 prior to receiving the wire. On the same day, AMENDOLA caused the following transactions, among others:

    a.     AMENDOLA wrote a $2,000 check from Wells Fargo Account #1 to Victim #2;

    b.     AMENDOLA wrote a $1,500 check from Wells Fargo Account #1 to M&T Bank for the $93,000 loan used to purchase AMENDOLA's 2017 Porsche Panamera; and

    c.     A transfer of $2,000 was made from Wells Fargo Account #1 to Wells Fargo Account #2, which had a balance of $1,036 prior to the transfer.

32. On September 19, 2019, Victim #4 wired $8,000 to Wells Fargo Account #1, which had a balance of $1,974 prior to receiving the wire. On the same day, AMENDOLA wrote a $2,500 check to Victim #2 and a $5,000 check to Victim #3 from Wells Fargo Account #1.

33. On September 25, 2019, Victim #13 wired $7,500 to Wells Fargo Account #1, which had a balance of $1,020 prior to receiving Victim #13's wires. On the same day, AMENDOLA wrote a $5,000 check to Victim #2 from Wells Fargo Account #1.

34.     From October 2 through 4, 2019, AMENDOLA caused the following transactions, among others:

      a.    Victim #13 wired $17,000 to Wells Fargo Account #1, which had a balance of $250 prior to receiving Victim #13's first wire on October 2, 2019;

      b.    A $3,000 check AMENDOLA wrote to Victim #3 cleared Wells Fargo Account #1;

      c.    A $10,898 cash withdrawal was made from Wells Fargo Account #1;

      d.    AMENDOLA made a Zelle payment of $500 from Wells Fargo Account #1 to Victim #10; and

      e.    A purchase of $1,219 was made at Best Buy with funds drawn on Wells Fargo Account #1.

*Victim #5*

35.     In July or August 2019, AMENDOLA showed Victim #5 the hemp farm owned by Company #1. AMENDOLA falsely and fraudulently told Victim #5 that Company #1 did not have any debt or other investors. AMENDOLA falsely and fraudulently told Victim #5 that he was looking for a short-term investor who could help with Company #1's branding and sales.

36.     On September 12, 2019, Victim #5 wired $8,000 to Wells Fargo Account #1, which had a balance of $89 prior to receiving the wire. On the same day, the transactions made from Wells Fargo Account #1 included a $500 Zelle payment to Victim #18, cash withdrawals totaling $2,800, and a $1,000 transfer to Wells Fargo Account #2.

37.     On September 18, 2019, Victim #5 wired $5,000 to Wells Fargo Account #1, which had a balance of $392 prior to receiving the wire. On the same day, AMENDOLA made a $500 Zelle payment to Victim #10, Zelle payments totaling $2,000 to another individual, and a $1,000 transfer to Wells Fargo Account #2, all from Wells Fargo Account #1.

### Victim #6 and Victim #7

38.     In January and February 2020 Victims #6 and Victim #7, who is Victim #6's spouse, lent AMENDOLA $30,000 after AMENDOLA falsely and fraudulently told Victim #6 that he had a CBD business named Company #1 and that he needed money to grow it and buy out a group of investors he had been working with, as he did not want them to obtain an equity interest in the business. After Victim #6 spoke with Victim #7 about investing in Company #1, they decided to lend AMENDOLA $30,000. AMENDOLA falsely and fraudulently promised to use the loan to buy out the investors AMENDOLA had been working with and to repay Co-Conspirator #1 some of the money Co-Conspirator #1 had put into Company #1.

39.     On January 28, 2020, AMENDOLA sent Victim #6 and Co-Conspirator #1 an email providing Company #1's PNC Bank account information and indicating that Co-Conspirator #1 was "100% supporting our efforts and will do what is necessary to guarantee you and [Victim #7] are secured and compensated for the advance."

40.     On February 27, 2020, Co-Conspirator #1 sent Victim #6 and AMENDOLA an email addressed to Victim #6 in which Co-Conspirator #1 falsely and fraudulently stated, in part, "Let this email stand as written documentation, that I agree to amend any paperwork necessary as recommended as per your advisor, as long as the financial terms and conditions do not change. Upon receipt of your transfer today,

-16-

Thursday February 27, 2020, you will have completed the full investment to [Company #1] as previously agreed and documented, of Thirty Thousand Dollars ($30,000.00). I agree to honor the terms and conditions of the Agreement as previously documented. Yet, should you decide to withdraw your investment, I agree to refund the full amount, plus any interest due, within 14 days of written notice."

41.    AMENDOLA drafted various false and fraudulent documents that purported to set forth the specifics of the agreement with Victims #6 and #7. One of the documents, a Secured Promissory Note dated January 24, 2020, which was signed by Co-Conspirator #1, stated that Company #1 would receive $30,000 from Victim #7 and in return Victim #7 would receive monthly interest payments of $2,500 or, at Victim #7's discretion, an additional one percent equity interest in Company #1. The note also provided that the payments to Victim #7 would begin on February 1, 2020, and that unpaid principal, earned interest, or converted equity would be payable in full on January 24, 2021. A second document, a Binding Memorandum of Understanding (MOU) signed by Co-Conspirator #1 on January 24, 2020, provided that Victim #7 would invest $30,000 in Company #1 and in return would receive a ten-percent ownership interest in Company #1. Additionally, the MOU provided that Victim #7 would also receive cash distributions of $2,500 or up to a twenty-percent ownership interest in Company #1.

42.    From January 31 through March 3, 2020, AMENDOLA caused the following transactions, among others:

a.    On January 31, 2020, Victim #6 withdrew $15,000 from a PNC Bank account and deposited the funds into PNC Bank Account #1, which had a balance of $25 prior to the deposit. The same day,

three withdrawals totaling $9,600 were made from PNC Bank Account #1.

b.    On January 31, 2020, a deposit of $5,000, which matched one of the withdrawals made from PNC Bank Account #1, was made to PNC Bank Account #2, which had a balance of $81 prior to the deposit.  The same day, Zelle payments of $500 were made from PNC Bank Account #2 to Victim #10 and another individual.

c.    On February 3, 2020, a Zelle payment of $1,000 was made to Victim #4 from PNC Bank Account #2 and a $2,000 check made payable to Victim #1 cleared PNC Bank Account #2.

d.    On February 3, 2020, cash withdrawals totaling $1,300 were made from PNC Bank Account #1.

e.    On February 10, 2020, a $1,500 check made payable to Victim #2 cleared PNC Bank Account #1.

f.    On February 14, 2020, a $5,000 check drawn on Victim #6's PNC Bank account was deposited into PNC Bank Account #1, which had a balance of $98 prior to the deposit.  With the exception of a $300 deposit on February 10, 2020, this was the first deposit made to PNC Bank Account #1 since Victim #6's $15,000 deposit on January 31, 2020.

g.    On February 27, 2020, a $10,000 check drawn on Victim #6's Navy Federal Credit Union account and made payable to Company #1 was deposited into PNC Bank Account #1, which had a balance of $71 prior to the deposit.  With the exception of deposits and

transfers totaling $950 that were made on February 28, 2020, no
additional deposits were made to PNC Account #1 until March 16,
2020.

h.    On March 2, 2020, a $850 check made payable to one of
AMENDOLA's sisters cleared PNC Bank Account #1.  The same day,
$4,000 was transferred from PNC Bank Account #1 to PNC Bank
Account #2, and a Zelle payment was made to Victim #4 from PNC
Bank Account #2.

i.    On March 3, 2020, a $1,500 check made payable to Victim #2
cleared PNC Bank Account #1, and Zelle payments of $500 were
made to Victim #4 and Victim #10 from PNC Bank Account #2.

*Victim #8*

43.    In the spring of 2020, Victim #8 transferred $21,142 from his TD
Ameritrade account to Co-Conspirator #1's TD Ameritrade Account.

44.    AMENDOLA had falsely and fraudulently told Victim #8 that he could
grow Victim #8's $21,000 to $30,000 in two weeks.  After two weeks, AMENDOLA
falsely and fraudulently told Victim #8 that AMENDOLA could give Victim #8 $30,000,
but that if Victim #8 let AMENDOLA keep trading with the money, AMENDOLA could
grow it to $100,000.

45.    From April 29 through May 4, 2020, AMENDOLA caused the following
transactions, among others:

a.    On April 29, 2020, a transfer of $21,141 was made from Victim #8's
TD Ameritrade account to Co-Conspirator #1's TD Ameritrade

Account, which had a closing value of $30,044 on April 30, 2020, the day after Victim #8's transfer was received.

b.    On May 1, 2020, a $20,000 wire was sent from Co-Conspirator #1's TD Ameritrade Account to United Bank account #3. By May 31, 2020, withdrawals and losses had reduced the value of Co-Conspirator #1's TD Ameritrade Account to negative $0.86.

46.    United Bank Account #3 had a balance of $6,050 prior to receiving the $20,000 wire from Co-Conspirator #1's TD Ameritrade Account on May 1, 2020. On the same day that the wire was received, $3,700 in cash was withdrawn from United Bank Account #3 and a $10,000 check, made payable to Co-Conspirator #1 and drawn on United Bank Account #3, was deposited in TD Bank Account #2, which had a balance of $553 prior to the deposit.

47.    On May 4, 2020, the transactions made from TD Bank Account #2 included a $2,000 electronic payment to Victim #9 and electronic payments totaling $5,750 to three other individuals.

*Other Victims*

48.    Through similar false and fraudulent statements, representations, and promises, AMENDOLA perpetrated the *Ponzi* scheme against other victims, including Victim #9, Victim #10, Victim #11, Victim #12, Victim #13, Victim #14, Victim #15, Victim #16, Victim #17, Victim #18, Victim #19, Victim #20, Victim #21, Victim Entity #1, Victim Entity #2, and Victim Entity #3.

THE PAYCHECK PROTECTION PROGRAM

49.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in March 2020 and designed to provide emergency financial

assistance to the millions of Americans who are suffering the economic hardships caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized over $300 billion in additional PPP funding.

50.     In order to obtain a PPP loan, the small business (through its authorized representative) must state, among other things, its average monthly payroll expenses and number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

51.     A PPP loan application must be processed by a participating financial institution (the lender). If a PPP loan application is approved, the lender funds the PPP loan using its own monies, which are one hundred percent guaranteed by Small Business Administration (SBA). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

52.     PPP loan proceeds must be used by the business on certain permissible expenses—such as payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on qualified expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least seventy five percent of the PPP loan proceeds on payroll expenses.

*Company #1's Fraudulent PPP Loan*

53.     In June 2020, Company #1 obtained an SBA-backed PPP loan of $43,292
(loan number x7802).  The approval and subsequent funding of this loan was based on
false information provided to the loan originator, Square Inc., d/b/a Square Capital
LLC, and by extension, to the lender, Celtic Bank, an SBA 7(a) lender and FDIC-insured
financial institution.

54.     To apply and obtain Company #1's PPP loan, AMEDNDOLA and Co-
Conspirator #1 caused false and fraudulent documents to be submitted to the loan
originator, and by extension, to the lender.  These included false and fraudulent copies
of an IRS Form 941 (Employer's Quarterly Federal Tax Return) for the first quarter of
2020 and a 2019 IRS Form 940 (Employer's Annual Federal Unemployment Tax
Return).  These tax documents falsely stated that Company #1's payments to employees
totaled $47,000 during the first quarter of 2020 and $179,210 in 2019.

55.     On April 21, 2020, the United States Treasury wired a $6,000 advance of
the proceeds of loan number x7802 to PNC Account #1, which had a balance of $150
prior to receiving the wire.  The same day, $6,000 was transferred from PNC Account #1
to PNC Account #2, which had a balance of $14 prior to receiving the transfer.  This
transfer was followed on the same day by a $3,400 wire from PNC Account #2 to Co-
Conspirator #1's TD Ameritrade Account.

56.     On June 3, 2020, the remaining proceeds of loan number x7802 were
wired by the lender to PNC Account #1, which had a balance of $28 prior to receiving
the wire.  The same day, $36,000 were transferred from PNC Account #1 to PNC
Account #2, which had a balance of $219 prior to receiving the transfers.  This transfer

was followed on the same day by a $5,000 withdrawal from PNC Account #2 and a $29,000 wire from PNC Account #2 to Co-Conspirator #1's Charles Schwab Account.

*Company #2's Fraudulent PPP Loan*

57.     In June 2020, Company #2 obtained an SBA-backed PPP loan of $45,729 (loan number x7901).  The approval and subsequent funding of this loan was based on false information provided to the loan originator, Square Inc., d/b/a Square Capital LLC, and by extension, to the lender, Celtic Bank, an SBA 7(a) lender and FDIC-insured financial institution.

58.     To apply and obtain Company #2's PPP loan, AMEDNDOLA and Co-Conspirator #1 caused false and fraudulent documents to be submitted to the loan originator, and by extension, to the lender.  These included false and fraudulent copies of an IRS Form 941 for the first quarter of 2020 and a 2019 IRS Form 940.  These tax documents falsely stated that Company #2's payments to employees totaled $59,875 during the first quarter of 2020 and $239,500 in 2019.

59.     On June 17, 2020, the proceeds of loan number x7901 were wired by the lender to PNC Account #2, which had a balance of $111 prior to receiving the wire.  This wire was followed on the same day by a $29,400 wire from PNC Account #2 to Co-Conspirator #1's Charles Schwab Account.

COUNT ONE

*Conspiracy and Attempt to Commit Wire Fraud and Bank Fraud – 18 U.S.C. § 1349*

THE GRAND JURY FURTHER CHARGES THAT:

Paragraphs 1 through 59 of the General Allegations are incorporated here by reference.

From at least in or about April 2017 through August 2020, in the Eastern District of Virginia and elsewhere, the defendant,

BRETT A. AMENDOLA,

and Co-Conspirator #1, together with others known and unknown, knowingly and intentionally conspired:

(a)    To violate 18 U.S.C. § 1343, that is, having devised and intending to devise any scheme or artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, to transmit and to cause to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice; and

(b)    To violate 18 U.S.C. § 1344, that is, to knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, and to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false and fraudulent pretenses, representations, and promises;

and knowingly and intentionally attempted to do so.

(In violation of 18 U.S.C. § 1349).

COUNTS TWO THROUGH EIGHT

*Wire Fraud – 18 U.S.C. § 1343*

THE GRAND JURY FURTHER CHARGES THAT:

Paragraphs 1 through 59 of the General Allegations are incorporated here by reference.

On or about the dates below, in the Eastern District of Virginia and elsewhere, the defendant,

BRETT A. AMENDOLA,

and Co-Conspirator #1, aided and abetted by themselves and others known and unknown, having devised and intending to devise any scheme or artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, each such execution constituting a separate count:

| Count | Victim | Approximate Dates |
|-------|--------|-------------------|
| TWO | Victim #1 | October 2018 through January 2019 |
| THREE | Victim #2 | November through December 2018 |
| FOUR | Victim #3 | July 2019 |
| FIVE | Victim #4 | August through October 2019 |
| SIX | Victim #5 | July through September 2019 |
| SEVEN | Victim #6 & Victim #7 | January through March 2020 |
| EIGHT | Victim #8 | April through May 2020 |

(In violation of 18 U.S.C. §§ 1343 and 2).

COUNTS NINE AND TEN

*Bank Fraud – 18 U.S.C. § 1344*

THE GRAND JURY FURTHER CHARGES THAT:

Paragraphs 1 through 59 of the General Allegations are incorporated here by reference.

From at least in or about April 2020 through June 2020, in the Eastern District of Virginia and elsewhere, the defendant,

BRETT A. AMENDOLA,

and Co-Conspirator #1, aided and abetted by themselves and others known and unknown, knowingly executed and attempted to execute a scheme or artifice to defraud a federally-insured financial institution, as defined in 18 U.S.C. § 20, that is, Celtic Bank, and to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of Celtic Bank by means of false and fraudulent pretenses, representations, and promises, each such execution constituting a separate count:

| Count | Borrower | Loan Amount |
|-------|----------|-------------|
| NINE | Company #1 | $43,292 |
| TEN | Company #2 | $45,729 |

(In violation of 18 U.S.C. §§ 1344 and 2).

NOTICE OF FORFEITURE

Defendant BRETT A. AMENDOLA is hereby notified, pursuant to FED. R. CRIM. P. 32.2(a), that upon conviction of the violation set forth in Count 1 of this Indictment, they shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A), as well as 28 U.S.C. § 2461(c), any property constituting, or derived from, proceeds obtained directly or indirectly as the result of the violation.

The defendant is further notified, pursuant to FED. R. CRIM. P. 32.2(a), that upon conviction of any of the violations set forth in Counts 2 through 8 of this Indictment, he shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), as well as 28 U.S.C. § 2461(c), any property, real or personal, that constitutes or is derived from proceeds traceable to the violation.

The defendant is further notified, pursuant to FED. R. CRIM. P. 32.2(a), that upon conviction of either of the violations set forth in Counts 9 through 10 of this Indictment, he shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly as the result of the violation.

Pursuant to 21 U.S.C. § 853(p), defendant shall forfeit substitute property, if, by any act or omission of defendant, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

(All in accordance with 18 U.S.C. §§ 981(a)(1)(C) & 982(a)(2)(A); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c); and FED. R. CRIM. P. 32.2.)

A TRUE BILL:

Pursuant to the E-Government Act,
The original of this page has been filed
under seal in the Clerk's Office

_____
FOREPERSON


RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By: _____
James P. Gillis
Assistant United States Attorney
Alejandra G. Arias
Kathryn DeMarco
Special Assistant United States Attorneys